Filed 3/16/21  P. v. Lobo CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E074016 |
| v. | (Super.Ct.No. RIF1503306) |
| DANIEL RAYMOND LOBO, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Thomas E. Kelly, Judge. (Retired judge of the Santa Cruz Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

Kristen Owen, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Melissa Mandel and A. Natasha Cortina, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Daniel Raymond Lobo took advantage of his position as a trusted uncle and molested his niece and nephew. On August 1, 2018, a jury convicted him of two counts of forcible lewd acts on a child (Pen. Code,[1] § 288, subd. (b)(1), counts 1 & 4 (K.J.)), one count of aggravated penetration on a child under 14 and seven or more years younger (§§ 269, subd. (a)(5), 289, subd. (a), count 2 (K.J.)), and one count of a lewd act on a child under 14 years old (§ 288, subd. (a), count 3 (A.J.)). The jury also found that he committed these offenses against more than one victim. (§ 667.61, subd. (e)(4).) The trial court sentenced him to an indeterminate term of 60 years to life.

On appeal, defendant challenges the admission of evidence of his prior uncharged sexual offenses, the sufficiency of the evidence to support his convictions, CALCRIM No. 1190's failure to define "complaining witness," and the effectiveness of his counsel. We reject his challenges and affirm.

## I. PROCEDURAL BACKGROUND AND FACTS

### A. *Background.*

Defendant was born in 1966. Around 1999, he met D. and, within four months of dating, began living with her in her parents' (the niece and nephew's grandparents) home, becoming a trusted member of the family. D.'s brother and sister-in-law (St. and Sh.) have six children, including A.J. (born in 1997), K.J. (born in 1999), and D.H. (born in 1996). In 2005, defendant and D. moved into St. and Sh.'s home in Moreno Valley.

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

2

*B.     The Prosecution's Case.*

*1.     Molestation involving A.J.*

In 2006, when A.J. was eight years old, she was playing basketball with defendant and some neighbor boys in front of her house. After the boys went inside, defendant "picked [A.J.] up from behind, from underneath [her] and was holding [her] up in the air, and he was grabbing [her vagina]. . . . [She] told him to put [her] down, and he told [her], 'No, it's okay. It's okay. Don't worry. It's going to be okay.' He held [her] up for a good two, three minutes, and then when he finally put [her] down, [she] ran to [her friends' home] and sat there until one of [the] boys walked [her] home." During the basketball game, defendant would lift her by the "waist, rib cage area" to dunk the ball, but this time she did not have any basketball in her hands nor was she near the hoop. He "had one hand on [her] chest, and the other one groping [her] from behind," and he lifted her "midway to his chest." A.J. felt his hand rubbing her vagina, "touching [her] in a way no uncle should."

Because A.J. was scared, she did not tell anyone until the next morning when she told her parents while they were at church. She "felt that [she] couldn't hold it in anymore." St. and Sh. immediately kicked defendant and D. out of their home; however, they did not call the police or tell the other children. They told the grandparents there had been "some inappropriate touching," and they needed to "keep their distance for a little while." Defendant and D. moved back into the grandparents' home.

In 2012 or 2013, when A.J. was 15 years old, she was at her grandparents' home. Defendant referenced her breasts, telling her, "'Oh, mija, your boobs are bigger than your

3

sister's.' or '[y]our sister's boobs are bigger than yours.'" On another occasion, when she was in the kitchen of her grandparents' home, defendant "trace[d her] underwear line with his fingers." A.J. promptly reported defendant's actions to her grandfather, who told defendant "that if he didn't stop, he would be kicked out." A.J. heard her grandfather talk to defendant, and the grandfather corroborated A.J.'s story.

### 2. *Molestation involving K.J.*

During 2003 and 2005, when K.J. was between four and six years old, she spent many nights at her grandparents' home in a guest bedroom. She recalled waking up to defendant "touching [her] thigh, and he would slowly move up and tell [her], 'It's okay.'" When "he got to [her] underwear, . . . he started rubbing and touching [her] vagina," over her clothing. She did not tell anyone, and defendant continued to do this to her at night, at least 10 times. Sometimes, he went underneath her clothing, and "he would put his hands on [her] vagina and rub it slowly." The incidents usually lasted between 10 to 45 minutes. K.J. was scared because her parents told her she should not "allow anybody to do that to [her], but at the same time, it was [her] uncle, so [she didn't] know what to do." She did not think she could tell her uncle to stop because she "didn't want to start any problems" or "lose the bond that [she] had with him." Also, defendant was "pretty big," and she was only four years old.

K.J. testified that she "used to wake up in the middle of the night, and [she] would have a burning sensation down there, on [her] vagina, and it hurt so bad, and [she] remembered the pain." She cried, and her "mom tried giving [her] baths [or putting

4

Vaseline on her vagina, but] it didn't work." She also stated that she wore a diaper at age nine and 10.

Sometime between 2006 and 2007, when K.J. was seven or eight years old, defendant digitally penetrated her. One night, while defendant was sitting on K.J.'s bed reading a story to her and her older brother (D.H.), he put his hand underneath the blanket and K.J.'s clothes, and he penetrated her vagina with his finger. K.J. was scared and said, "'No. Stop.'" D.H. saw defendant's hand under the blanket. At trial, he recalled that defendant did "it slowly—like he was trying to be low key about it, just slowly up the blanket, under the blanket, going up toward her." After D.H. heard K.J. tell defendant to stop, D.H. asked what defendant was doing, and he replied, "'It's okay. Go back to bed.'" D.H. told defendant to stop, or he would tell his parents. Defendant replied, "'Well, if you do that, then, . . . how are you going to protect your sisters?'" He also "threatened that nobody would believe [D.H.] . . . because of [his] past record" of lying. D.H. did not want his mother to think that he was lying again, so he did not disclose what defendant had done. He also believed it was going to stop, and K.J. "never brought it up," so he "figured it stopped." D.H. did not want to testify because "[b]ringing it up [was] too much for [him]." He only testified because the trial court issued a bench warrant for his appearance.

K.J. did not tell her parents about defendant's digital penetration because she was scared, and she did not think "it was going to continue" because "he was out of the house." However, about two months later, defendant resumed sexually touching K.J. at her grandparents' house. She recalled, "It was like the same thing almost every time, and

5

he would just rub. He never penetrated me after he got caught by my brother." When K.J. was 11 years old, defendant started making comments about "[her] breasts and [her] butt, . . . telling [her] what guys would look for." He also ran his hand "along [her] butt, and he would tell [her], 'You're getting . . . lady lumps, and that's another thing guys like.'"

In October 2015, when K.J. was 16 years old, she reported defendant's molestations. While she was taking care of one of her nephews, she learned that a family member was "touching him and molesting him, and it really made [her] mad that no one was doing anything about it." This caused her to start "getting all these feelings, and [she] started remembering bits and pieces, and then it was like all [her] emotions came crashing." K.J. explained: "Like the smell of his cologne would bring back a memory that I didn't want to remember. Someone with the same facial beard, goatee, it would bring back memories I don't want to remember. It just—it was anything that resembled him. It could be a man. Um, I was working when I came out about it, shortly after I started working; and I'd break down in the bathroom because I'd see someone who looked like him come into work, and it would just bring back, just, feelings I never felt before. I felt like I was going crazy." Unable to stop thinking about what defendant had done to her, K.J. started "acting out," rebelling against her parents, and yelling at them until they finally said, "'Something's wrong.'" K.J. told them that defendant had touched her. She "felt horrible" and blamed herself "because [she] felt like [she] could have said something sooner." K.J. talked to her counselor at church and then talked to the police.

K.J. was scared of not being believed, of what would happen to her family, and what would happen with her relationship with her aunt and grandparents. A year after reporting defendant's molestations, she attempted suicide and was committed to a psychiatric hospital. After she was released, she resorted to self-medication with drugs, but "nothing worked. It made [her] always feel worse." Before defendant's trial, K.J. continued to struggle and was doing drugs. In early 2018, she was arrested for stealing a car; she pled guilty and took responsibility for her actions. She testified that she reported defendant's molestation because she did not "want . . . any other female, whether they're little or to [her] age now, . . . to ever feel the way [she] felt."

           *3.     Evidence of defendant's prior uncharged sexual offenses.*

Defendant's sister lived down the street from defendant and the grandparents. Her children, A.A. and R.R., "spent a lot of time in [their] grandparents' home because [their] mother worked a lot, [their] grandmother watched [them], and [defendant] was always there." Around 1983 or 1984, when A.A. was "under five," defendant (around 16 or 17 years old) was tasked with bathing her and R.R., who was six or seven years old at the time. Defendant would "[f]ondle, rub, [and] penetrate" her vagina, touch R.R.'s penis, and direct them to touch each other. A.A. was uncomfortable and "couldn't" do it, but defendant would say, "'It will be okay.'" Defendant "compliment[ed] [A.A.'s] body, [told her] how pretty [she] was, [and that] it was natural [and] . . . okay." A.A. recalled "three separate incidents" vividly.

When A.A. was between the ages of "six and nine," defendant called her into the bathroom of her grandmother's house. He "shut the door behind [her], . . . had [her] lay

7

down," and removed her pants and underwear. He removed his pants, and she could see he "had a semi-erection." He told her to open her legs. She watched him put Vaseline on his penis and climb on top of her. He started to penetrate her, but "when he heard [her] grandmother, he leaned back[, and] said, 'Get your clothes and get out of here.'" A.A. picked up her clothes and left. She did not tell anyone about the incident until she was older. Her mom did not call the police, but they moved to another home without defendant.

When A.A. was in middle school, they lived down the street from her grandmother's house. Defendant had "just gotten out of rehab . . . and he came back" to live with the grandparents. There was a family gathering at A.A.'s house, and defendant asked her to retrieve something from the rafters in the garage. As A.A. was getting down, her legs were "dangling, [and] he said, 'Just get on my shoulders and stand on my shoulders.'" When she started to do so, "he turned his body around to where his face was facing [her] crotch area . . . and he started, like, gnawing at [her] crotch in a sexual fashion." A.A. estimated it lasted about 15 to 30 seconds. She "kept trying to twist [her] hips to get around to the other side of his shoulders," but he was "emulating fellatio" while "holding [her] back." A.A. did not tell her mother about defendant's actions because her mother always worked and left A.A. and R.R. to "fend for [them]selves, to take care of each other." However, A.A. told R.R. what defendant had done. A.A. and R.R. ran away from home because of defendant and because "nobody listened" to them. When A.A. returned, she told her mother what defendant had done and said she would not stay at home if her mother "kept letting [defendant] back in the house." A.A. "saw a

8

pattern that was never going to change." The family moved, and her mother "promised" that defendant "would never be there."

However, at the new house, A.A.'s mother invited defendant to their housewarming party. Defendant asked for A.A.'s forgiveness. A.A. asked defendant, "'Can you promise me you'll never touch anybody ever again?'" Defendant replied, "'Yes.'" He "promise[d]" both A.A. and R.R. "that he was not going to touch . . . kids again." He explained that "he was on drugs, and it was a part of drug addiction, and he was going to be sober, and he was going to be better, and he was going to be the uncle [she] should have." She forgave him.

A few years after the apology, when A.A. was 17, she was told that defendant was doing well, he was married, and had stepchildren. When her family visited defendant, A.A. asked him whether he had told his wife about his past, and he replied, "'No.'" A.A. stayed away from her whole family after that visit.

Around 1997, when she was 18, she joined the Marine Corps and eventually got married. In January 2016, R.R. committed suicide, which was about two weeks after defendant had been arrested. At his funeral, A.A. learned about defendant's molestation of A.J. and K.J. A.A. spoke to law enforcement about defendant after she was contacted by the district attorney's office.

*C.    The Defense.*

On December 8, 2015, Detective Vargas from the Riverside County Sheriff's Department interviewed defendant after he waived his *Miranda*[2] rights. During the interview, defendant denied touching anyone inappropriately or having an opportunity to go into their bedrooms at night. He attacked the credibility of his victims' family members. For example, he accused St. and Sh. of having "wicked ways." He said Sh. was unfaithful, and St. liked to watch Sh. in the process. He claimed their children would pick the bathroom lock, and they would walk in on him while he was dressing and using the bathroom. He accused A.J. of using sex for love (like her mother) and rubbing her chest against him. He said D.H. was a "pothead" who used "his bipolar and his ADHD, ADD as an excuse to be able to get high." Defendant claimed that (1) he avoided inappropriate touching by being careful about "where [his] hands fall," (2) he talked about the Bible and would "sing and pray" with the children, (3) he tried to get the children to respect themselves, and (4) he only covered the girls with blankets when they were at his house. He provided elaborate and confusing stories to explain why he was being accused.

Defendant testified in his own defense. By the time trial began, he was 51 years old. Regarding the basketball incident involving A.J., he claimed that he picked her up by the waist to "slam the ball." He remembered it because she suffered from "low self-esteem" and "cried just because she dropped the ball." Defendant acknowledged A.J.'s claim that he "put [his] hand in between her legs," but he thought her parents asked him

---

[2]  *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

to leave because he had accidentally touched her thigh while moving her off of his lap while the whole family was watching television. He claimed that on the same day they played basketball, they also watched a scary movie.

When asked about putting his "finger along her . . . panty line," defendant admitted pointing at A.J.'s underwear line and saying, "'That's what I'm talking about.'" Defendant denied touching A.J.; he claimed he told his nieces to stop dressing provocatively. He explained that he commented on A.J.'s breasts and bottom in order to protect her. He testified that he would tell the girls, "'Please, watch yourself. It's not a nice world. You're going to lead boys out there to thinking something.'" He would tell the girls that they were "'enticing'" boys. When A.J. and K.J.'s grandfather told defendant he would kick him out of the house if he spoke that way again, defendant testified it was "another reason [he] did it . . . because nobody told [the girls] it was wrong to be showing revealing clothing."

Regarding K.J., defendant claimed that when he would get a "midnight snack," he would go into her bedroom to cover her up with a blanket. When his in-laws or wife requested, he would give K.J. "Nyquil or some kind of sleep aid." He denied inappropriately touching her and assumed it was misunderstood or imagined.

D.     *Stipulations.*

The parties stipulated that: (1) A.A.'s mother was not available to testify because she passed away in 2005; (2) A.A.'s brother (R.R.) was not available to testify because he passed away in 2016; and (3) a copy of A.A.'s witness statement taken by the district

11

attorney's office was provided to and received by defense counsel Markson in May 2016 and defense counsel Carnero in June 2018.

## II. DISCUSSION

Defendant contends (1) the trial court abused its discretion in admitting evidence of his prior uncharged sexual offenses under Evidence Code section 1108; (2) there is insufficient evidence to support counts 1, 2, 3, and 4; (3) the court erred by failing to define "complaining witness" in CALCRIM No. 1190; (4) his counsel was ineffective in numerous respects; and (5) the cumulative error doctrine applies.

### A. *Admission of Testimony Relating to Prior Uncharged Sexual Offenses.*

Defendant contends the trial court abused its discretion in admitting evidence of his prior uncharged sexual offenses, which he describes as "highly inflammatory," because the prejudicial effect of A.A.'s testimony outweighed its probative value, and the error denied defendant his right to a fair trial because it so infused the trial with unfairness as to deny due process of law. We conclude the evidence was properly admitted.

#### 1. *Additional Factual and Procedural Background.*

Before trial, the prosecutor moved to admit evidence of defendant's prior sexual offenses involving A.A. and her brother R.R. under Evidence Code section 1108 on the grounds the evidence was highly probative of defendant's propensity to commit the charged offenses, and it corroborated the current victims' accusations. The prosecutor argued: "Rarely are there witnesses to a sexual assault other than the victim and the defendant. Therefore, prosecutions become swearing matches between the defendant and

12

victim. Uncharged acts can help resolve these swearing matches because they provide corroboration of the victim's testimony." Defense counsel objected, arguing defendant's prior offenses were remote (from 25 years earlier), highly prejudicial, and would confuse the jury, resulting in his conviction for conduct not charged in this case. The prosecutor responded that "the 1108 evidence is actually about 10 to 15 years earlier than the charged crimes here," and "a special instruction [will tell] the jury how to handle 1108 evidence."

In deciding whether to admit the evidence, the trial court observed the following: (1) the Evidence Code section "1108 evidence clearly is probative" because "the conduct alleged . . . is quite similar to what occurred to one of the girls" and corroborates the victims' claims; (2) the "1108 evidence" is probative because of the "similar type of [unusual] behavior"; (3) the "1108 conduct is no more inflammatory than what's currently charged"; (4) there is "a 10-year difference [and] I think more probative is the fact that both girls were about the same age when they were victimized, so in the sense, it's not remote. It's a certain age of victim, and so that's . . . a point of similarity which makes it all the more probative." Also, "the legislature did not put in a timeliness issue under 1108, so it's less of a concern"; (5) "[c]onsumption of time. It won't take long. And . . . the defendant has had notice, has the police reports"; (6) there is "a multiplicity of . . . acts[, which] makes it clear what the intent is of the person doing those deeds. When you have one or two, you might have some ambiguity. When you have multiple acts, the intent becomes more clear and becomes more probative"; and (7) because there are no convictions, this "would be a factor for the defense."

13

After considering the Evidence Code section 352 factors, the court determined the section 1108 evidence should be admitted.

### 2.    *Applicable Legal Principles.*

Evidence Code section 1108 is designed to allow the admission of evidence that is otherwise inadmissible under section 1101, subdivision (a), i.e., evidence of a person's character or trait to prove propensity or criminal disposition.  (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 822-823.)  Section 1108, subdivision (a), states that when a "defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352."  "Section 352 articulates the general rule that '[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.'  [Citation.]  'It follows that if evidence satisfies the requirements of section 1108, including that it is not inadmissible under section 352, then the admission of that evidence does not violate section 1101.'  [Citation.]  The trial court's ruling admitting evidence under these provisions is reviewed for an abuse of discretion."  (*People v. Erskine* (2019) 7 Cal.5th 279, 296.)

### 3.    *Analysis.*

Defendant argues that the trial court abused its discretion in admitting A.A.'s testimony because it was "highly inflammatory."  It elevated him from a mere pedophile of two nonblood nieces to one who molested blood relatives, both a niece and a nephew,

14

forced incestuous-like acts between brother and sister, had brief interrupted intercourse with a small child, and caused them a lifetime of trouble that included running away from home and suicide. He asserts that his situation is similar to *People v. Harris* (1998) 60 Cal.App.4th 727 (*Harris*). We disagree.

In *Harris*, the defendant was a mental health nurse accused of "preying on women who were vulnerable due to their mental health condition." (*Harris*, *supra*, 60 Cal.App.4th at p. 730.) The incidents occurred in 1995 and consisted of licking/sucking their breasts, digital penetration, and oral copulation. (*Id*. at pp. 731-732.) At trial, the prosecution introduced evidence that in 1972, defendant unlawfully entered the apartment of a woman "while she was sleeping, beat her unconscious and used a sharp instrument to rip through the muscles from her vagina to her rectum, then stabbed her in the chest with an ice pick, leaving a portion of the pick inside her." (*Id*. at p. 733.) The reviewing court was concerned with the inflammatory nature of the prior uncharged act, characterizing it as "inflammatory *in the extreme*." (*Id*. at p. 738; see *People v. Ewoldt* (1994) 7 Cal.4th 380, 405 [when evaluating prior uncharged acts under to Evid. Code, § 352, it is important to consider whether "[t]he testimony describing defendant's uncharged acts . . . was no stronger and no more inflammatory than the testimony concerning the charged offenses."].) Since the 1972 incident was far more violent than the offenses for which the defendant was on trial, "totally dissimilar to the current allegations," "remote, inflammatory and nearly irrelevant and likely to confuse the jury and distract it from the consideration of the charged offenses," the reviewing court concluded that the "inflammatory and speculative

15

nature of the evidence weighs sharply in favor of exclusion." (*Harris*, at pp. 738, 740-741.)

Here, the offenses involved in the prior acts were not "inflammatory *in the extreme*." (*Harris*, *supra*, 60 Cal.App.4th at p. 738.) When applying this factor, we consider "whether the evidence inflames the jurors' emotions, motivating them to use the information, not to evaluate logically the point upon which it is relevant, but to reward or punish the defense because of the jurors' emotional reaction." (*People v. Valdez* (2012) 55 Cal.4th 82, 145.) Although the incidents involving A.A. and R.R. were harmful to defendant's case, they were no more inflammatory than the testimony concerning the charged offenses, and there is no reason to believe they confused the jury or caused them to decide the case on an improper basis. The same reasoning applies to the evidence of defendant's niece and nephew suffering a "lifetime of trouble that included running away from home and suicide." The jury heard similar testimony from K.J., who relayed her mental problems, drug use, and criminal behavior. Although A.A. testified that R.R. committed suicide two weeks after defendant's arrest, there was no evidence, nor argument from the prosecutor, that attributed the suicide to defendant's molestations. And, the jurors were instructed with CALCRIM No. 1191 that they "may, but [were] not required to," conclude "defendant was disposed or inclined to commit sexual offenses," and that drawing such a conclusion was "only one factor to consider along with all the other evidence."

We are also not persuaded that the prior acts had little probative value. Defendant's prior acts were highly probative because they show how he used his position

of trust to act upon his deviant sexual urges toward very young children. The evidence that defendant initiated sexual intercourse with A.A. is similar to the evidence of his digital penetration of K.J. In both instances, defendant advanced the severity of his sexual misconduct. Although he was stopped from proceeding further with each victim, he returned to engaging in less invasive sexual conduct. The evidence that defendant forced incestuous-like acts (touching private areas) between A.A. and R.R., while distinctive from "the charged acts," is a distinction without a difference, given the underlying similarity of a trusted uncle personally engaging in lewd and lascivious acts with children as young as four and continuing through their teens. (See *People v. Frazier* (2001) 89 Cal.App.4th 30, 40-41, 43 [no abuse of discretion to admit evidence of the defendant's uncharged acts of sodomy and forcible oral copulation of his six-year-old cousin even though they were different from the charged act of touching the bare buttocks of his nine-year-old niece].) Also, defendant's prior acts bolstered A.J. and K.J.'s credibility. (See *People v. Falsetta* (1999) 21 Cal.4th 903, 911-912 ["'The Legislature has determined the need for [Evidence Code section 1108] evidence is "critical" given the serious and secretive nature of sex crimes and the often resulting credibility contest at trial.'"].)

We do not view the prior acts as requiring an undue consumption of time, being too remote, or making it impossible to defend. The evidence involved the testimony of one witness, A.A. Although the witness (R.R.) that could have refuted A.A.'s allegations was deceased, it was not impossible for defendant to defend himself against A.A.'s uncharged and uncorroborated allegations. A.A. testified that her mother always worked,

17

left them (A.A. and R.R.) to "fend for [them]selves, to take care of each other," and broke her promise to not allow defendant back in their house. Thus, the jury was presented with evidence that A.A. and R.R.'s home situation, which prompted their decision to run away, also may have influenced A.A.'s testimony.

Nor do we find the time span prevented defendant from defending against the charges. "[N]o specific time limit exists as to when an uncharged crime is so remote as to be excludable." (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1099; see, e.g., *People v. Robertson* (2012) 208 Cal.App.4th 965, 992-994 [upholding admission of sex crime committed 30 years before the charged crime]; *People v. Branch* (2001) 91 Cal.App.4th 274, 284-285 [same]; *People v. Waples* (2000) 79 Cal.App.4th 1389, 1392-1395 [continuous molestation occurring 18 to 25 years before the charged crimes]; *People v. Soto* (1998) 64 Cal.App.4th 966, 977-978, 991-992 [victims were the defendant's sister and niece; continuous molestation occurring 22 and 30 years before the charged crimes, and additional molestation about 22 years before the charged crimes].) Here, defendant received notice of the claims he had to defend against, and he recalled every incident and provided a counter-narrative. Moreover, the fact there was no police investigation or charges relating to his prior acts does not mean A.A.'s testimony lacked sufficient measures of reliability. Although she did not know A.J. or K.J., her description of defendant's deviant behavior was similar to theirs. Also, she grew up in a family culture of denial and forgiveness from which defendant benefited.

For the above reasons, we conclude the trial court did not abuse its discretion by finding the evidence of defendant's prior acts was not inadmissible under Evidence Code

section 352. Because the trial court acted within its discretion, we reject defendant's constitutional claims. (*People v. Mills* (2010) 48 Cal.4th 158, 195-196 [the routine application of state evidentiary law does not implicate a defendant's constitutional rights]; *People v. Falsetta*, *supra*, 21 Cal.4th at p. 913 ["The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair."].)

   B.    *Sufficiency of Evidence.*

Defendant challenges the sufficiency of the evidence to support his convictions.

"In considering a challenge to the sufficiency of the evidence . . . , we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value— from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.'" (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60.)

     1.    *Counts 1, 2, and 4.*

Defendant contends the evidence was insufficient to prove that the relevant acts against K.J. were committed by the use of force or implied threats. He thus argues his convictions on counts 1, 2, and 4 should be reduced to the lesser, nonaggravated versions,

and his sentence should be modified. The People assert the convictions are amply supported by evidence of duress, given the difference in defendant's and K.J.'s ages and sizes, his position of authority over K.J., the continuity of the assaults, and K.J.'s testimony that she was afraid. We conclude the convictions are amply supported by evidence of duress.

a.   Applicable legal principles.

Defendant was convicted of two counts of forcible lewd acts on a child. (§ 288, subd. (b)(1).) Under section 288, subdivision (b)(1), any person who commits a lewd or lascivious act upon a child under 14 "by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person, is guilty of a felony . . . ." Defendant was also convicted of one count of aggravated penetration on a child under 14 and seven or more years younger. (§§ 269, subd. (a)(5), 289, subd. (a).) Section 289, subdivision (a)(1) provides, "Any person who commits an act of sexual penetration when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person shall be punished by imprisonment in the state prison for three, six, or eight years."

There is no requirement that defendant had to have outright threatened the victim in order to sustain a conviction under these statutes. Rather, duress is an independent aggravating factor apart from the others listed. (*People v. Schulz* (1992) 2 Cal.App.4th 999, 1005 ["'Duress' would be redundant in the cited statutes if its meaning were no different than 'force,' 'violence,' 'menace,' or 'fear of immediate and unlawful bodily

20

injury.'"].) Under the applicable statutory context, duress means "'a direct or *implied* threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) *acquiesce* in an act to which one otherwise would not have submitted.'" (*People v. Cochran* (2002) 103 Cal.App.4th 8, 13 (*Cochran*), italics added, disapproved on another ground in *People v. Soto* (2011) 51 Cal.4th 229, 248, fn. 12.) This definition is "objective in nature and not dependent on the response exhibited by a particular victim." (*Soto*, at p. 246.) It may take the "'form of psychological coercion'" (*id*. at p. 243), or it may "arise from various circumstances, including the relationship between the defendant and the victim and their relative ages and sizes." (*Schulz*, at p. 1005; see *People v. Thomas* (2017) 15 Cal.App.5th 1063, 1072-1073 ["When the victim is young and is molested by her father in the family home, duress will be present in all but the rarest cases."].) Juries are instructed to "consider all the circumstances" in evaluating duress, including "the age of the child and [her] relationship to the defendant." (CALCRIM No. 1111; see CALCRIM No. 1045.)

### b.    Analysis.

Substantial evidence supports a finding that defendant committed his crimes through duress. Defendant began conditioning K.J. to accept his molestation when she was four or five years old. She would wake up in the guest bedroom at her grandparents' home to him "touching [her] thigh, and he would slowly move up and tell [her], 'It's okay.'" When "he got to [her] underwear, . . . he started rubbing and touching [her] vagina," over her clothing. Sometimes he went underneath her clothing, and "he would

21

put his hands on [her] vagina and rub it slowly." K.J. was scared, but she had known defendant her entire life, loved him, and did not want to "lose the bond that [she] had with him." Although defendant was her uncle (not her father), she had been taught to "listen to what [an adult family member] says, [and] not back talk." Also, he was an adult male who was significantly larger than her, and she had no means of escape. She was alone in the bed, late at night, and had been given "Nyquil or some kind of sleep aid" on many nights. The only time K.J. stopped defendant from his molestation was when he digitally penetrated her. Coincidentally, that was the only time another person, her brother, was present. After that incident, defendant still touched and rubbed her, just "[n]ot as often." K.J. did not consent to defendant's molestations; rather, she endured them out of fear and duress.

Defendant's reliance on *People v. Hecker* (1990) 219 Cal.App.3d 1238 (*Hecker*), overruled on other grounds in *People v. Soto*, *supra*, 51 Cal.4th at p. 248, fn. 12, does not alter our conclusion. The same court that decided *Hecker*, decided *Cochran* 12 years later. "In *Hecker*, the defendant molested his 12-year-old stepdaughter. She testified she was never consciously afraid the defendant would harm her and that, with the exception of one incident where he held her head down during oral copulation, he never used physical force. She did not report the incidents because she felt "'guilty'" and did not want to be responsible for breaking up her mother's marriage. [Citation.] She testified she felt "'pressured psychologically'" and "'subconsciously afraid.'" [Citation.] '[T]here was no evidence [the defendant] was aware of and sought to take advantage of such fear.' [Citation.] [The *Hecker* court] stated: "'Psychological coercion" without more does not

22

establish duress. At a minimum there must be an implied threat of "force, violence, danger, hardship or retribution."' [Citation.] [The *Hecker* court] rejected the People's argument that duress was established by the victim's testimony that the defendant urged her not to report the molestations because it would ruin his marriage and naval career, stating 'such testimony establishes merely the threat of hardship directed at "later disclosure of the sex acts and not [the failure to perform] the sex acts themselves."'" (*Cochran*, *supra*, 103 Cal.App.4th at p. 14.)

The *Cochran* court found the language in *Hecker* to be overly broad, explaining, "The very nature of duress is psychological coercion. A threat to a child of adverse consequences, such as suggesting the child will be breaking up the family or marriage if she reports or fails to acquiesce in the molestation, may constitute a threat of retribution and may be sufficient to establish duress, particularly if the child is young and the defendant is her parent. We also note that such a threat also represents a defendant's attempt to isolate the victim and increase or maintain her vulnerability to his assaults." (*Cochran*, *supra*, 103 Cal.App.4th at p. 15.)

Finding sufficient evidence of duress, the *Cochran* court stated: "The victim was only nine years old. [The defendant] is her father with whom she resided. She was four feet three inches tall. He was five feet nine inches tall and outweighed her by about 100 pounds. The sexual acts occurred in the family home she shared with [him] and her mother. Throughout the videotape, [the defendant] directs and coaches the victim what to do. It is clear [she] is reluctant to engage in the activities and, at most, acquiesces in the conduct. . . . [¶] . . . Although she testified she was not afraid of [the defendant], that he

23

did not beat or punish her and never grabbed or forced her, she also testified she was mad or sad about what he was doing to her . . . . [¶] This record paints a picture of a small, vulnerable and isolated child who engaged in sex acts only in response to her father's parental and physical authority. Her compliance was derived from intimidation and the psychological control he exercised over her and was not the result of freely given consent. Under these circumstances, given the age and size of the victim, her relationship to the defendant, and the implicit threat that she would break up the family if she did not comply, the evidence amply supports a finding of duress." (*Cochran*, *supra*, 103 Cal.App.4th at pp. 15-16, fns. omitted.)

While *Cochran* differs from this case in that defendant is K.J.'s uncle, and he never warned her not to report the molestations, the case is sufficiently similar given K.J.'s very young age (younger than the victim in *Cochran*) and size, her relationship to defendant, his reassuring words that it was okay, and the fact that she was taught to "listen to what [an adult family member] says, [and] not back talk." "[A]s a factual matter, when the victim is as young as this victim and is molested by her father in the family home, in all but the rarest cases duress will be present." (*Cochran*, *supra*, 103 Cal.App.4th at p. 16, fn. 6.) Again, although defendant is K.J.'s uncle, rather than her father, he held a similar position of authority in her home as an adult family member, which supports a finding of duress, along with K.J.'s testimony that she was scared. (*People v. Schulz*, *supra*, 2 Cal.App.4th at p. 1005 ["[D]uress involves psychological coercion. [Citation.] . . . 'Where the defendant is a family member, and the victim is young, . . . the position of dominance and authority of the defendant and his continuous

24

exploitation of the victim' [are] relevant to the existence of duress."].) We, therefore, conclude there was sufficient evidence of duress.

   *2.*  *Count 3.*

  Defendant challenges the finding that he violated section 288, subdivision (a), on the ground the evidence was insufficient to show that he intended to arouse his own or A.J.'s sexual desires. He bases his contention on the fact A.J. alleged that he touched her one time on her vagina, over clothes, when she was young, during a basketball session, in the middle of the neighborhood street, with A.J.'s parents only a few doors away, and he never said anything sexual or made any sexual noises while the touching occurred.

    a.  Applicable legal principles.

  Section 288, subdivision (a), in relevant part, provides: "[A] person who willfully and lewdly commits any lewd or lascivious act . . . upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, *with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person* or the child, is guilty of a felony . . . ." (Italics added.) "[S]ection 288 is violated by 'any touching' of an underage child accomplished with the intent of arousing the sexual desires of either the perpetrator or the child." (*People v. Martinez* (1995) 11 Cal.4th 434, 452.) The statute provides children with "'special protection' from sexual exploitation, . . . [because they] are 'uniquely susceptible' to such abuse as a result of their dependence upon adults, smaller size, and relative naiveté. . . . [¶] For this reason, the courts have long indicated that section 288 prohibits *all* forms of *sexually motivated contact* with an underage child. Indeed, the 'gist' of the offense has always been the defendant's *intent to sexually exploit*

25

*a child, not the nature of the offending act.* [Citation.] '[T]he purpose of the perpetrator in touching the child is the controlling factor and each case is to be examined in the light of the intent with which the act was done. . . .'" (*Id.* at pp. 443-444, first italics in original, other italics added.) "[A] lewd or lascivious act can occur through the victim's clothing and can involve 'any part' of the victim's body." (*Id.* at p. 444.)

b.     Analysis.

Substantial evidence supports a finding that defendant performed the charged lewd act with the requisite intent. According to A.J., defendant placed his hand over her vagina and rubbed it while grabbing her chest. Defendant acknowledged that if he grabbed her from in between her legs, lifted her up, and his hand was on her vagina, it would be "inappropriate," nonaccidental, and "sexual in nature." However, he claimed that he never touched her inappropriately when picking her up to make a basket. Although A.J. was only eight years old, when she felt defendant's hand rubbing her vagina, she knew that he was "touching [her] in a way no uncle should." She reported defendant's action the next morning, and her parents kicked defendant and D. out of their home.

While intent is rarely proven by direct evidence, it may be inferred from the circumstances. "Circumstances which have been considered relevant to proving intent to satisfy sexual desires include: *the charged act*, extrajudicial statements, the relationship of the parties, *other acts of lewd conduct*, coercion or deceit used to obtain the victim's cooperation, attempts to avoid detection, offering of a reward for cooperation, a stealthy approach to the victim, admonishment of the victim not to disclose the occurrence,

26

physical evidence of sexual arousal and clandestine meetings." (*In re Jerry M.* (1997) 59 Cal.App.4th 289, 299, italics added.) Here, in addition to accusing defendant of inappropriately touching her on the basketball court, A.J. accused defendant of tracing her underwear line when she was 15 years old, and her sister K.J. accused him of rubbing her vagina both on top and underneath her clothes.

Defendant's comparison of his case to *People v. Mansell* (1964) 227 Cal.App.2d 842 is misplaced. In *Mansell*, the defendant was charged with two counts of touching minors with lewd intent when he placed his hands between or near the crotches of three young neighborhood girls that he had been bouncing on his knee. (*Id*. at pp. 842-845.) The Court of Appeal found there was insufficient evidence to support the charges. It rejected the prosecution's theory "that defendant was fondling the private parts, or something close to that area of the body, and that a lewd intent may be inferred from what he did" because "[t]he confused, contradictory and fragmentary descriptions given by the children indicate at most that on two occasions, in public view, defendant held the girls on his knee and in the course of this he put his hand at or near the area of suspicion." (*Id*. at p. 847.) Because there was no evidence from which to infer an intent to sexually arouse himself, the appellate court found no evidence which would distinguish the defendant's conduct from "the most innocent play with neighbor children." (*Id*. at p. 848.) The *Mansell* court relied heavily on the inconsistencies in the victims' testimony and the fact that there was no independent evidence of the defendant's lewd intent. Such is not the case before this court, given the totality of the circumstances involving both A.J. and K.J.

### C. Failure to Define "Complaining Witness" in CALCRIM No. 1190.

Defendant contends the trial court erred in instructing the jury with CALCRIM No. 1190, which states: "Conviction of a sexual assault crime may be based on the testimony of a complaining witness alone." He argues this was improper because the court failed to define the term, "complaining witness." He asserts it was necessary to define this term so the jury would know that a verdict on a particular count could not be based solely on the testimony of (1) a complaining witness (A.A.) who testified about uncharged acts of molestation, or (2) a complaining witness (A.J. and K.J.) who testified about acts involving another count. He further asserts that other instructions, CALCRIM Nos. 301[3] and 303,[4] made the problem worse because they emphasized the importance of one witness's testimony while also instructing that certain evidence was admitted for a limited purpose; however, the jury was not explicitly told in what respect it should disregard evidence. As we explain, we reject defendant's contentions.

To begin with, we note that defendant offered no objection to CALCRIM No. 1190, nor did he raise the issue below or ask the trial court for a special instruction

---

[3] CALCRIM No. 301 states in part: "[T]he testimony of only one witness can prove any fact. Before you conclude that the testimony of the witness proves a fact, you should carefully review all the evidence."

[4] CALCRIM No. 303 states: "During the trial, certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other."

28

containing a definition of the term, "complaining witness."[5]  Nonetheless, on appeal, he

suggests his counsel's closing argument and exchange with the court constituted an

objection.[6]  "[T]he failure to object to an instruction in the trial court waives any claim of

error unless the claimed error affected the substantial rights of the defendant, i.e., resulted

in a miscarriage of justice, making it reasonably probable the defendant would have

---

[5]  "Although trial courts, generally, have a duty to define technical terms that have meanings peculiar to the law, there is no duty to clarify, amplify, or otherwise instruct on commonly understood words or terms used in statutes or jury instructions.  'When a word or phrase "'is commonly understood by those familiar with the English language and is not used in a technical sense peculiar to the law, the court is not required to give an instruction as to its meaning in the absence of a request."'"  (*People v. Griffin* (2004) 33 Cal.4th 1015, 1022-1023.)

[6]  After discussing the credibility of A.J. and K.J. extensively, defense counsel stated:
"[DEFENSE COUNSEL]:  Now, the law says that you only need one witness.  Their words alone are enough to convict [defendant].  But . . . I believe in the . . . *CSI* standard.  You have to have more than that, you know, to convict somebody—
"[PROSECUTOR]:  Objection, your Honor.
"[DEFENSE COUNSEL]:  —in a case like this.
"THE COURT:  Sustained.  It's not the law.
"[DEFENSE COUNSEL]:  I told them it's not the law.
"THE COURT:  Don't give them your opinion, though, about what you believe.
"[DEFENSE COUNSEL]:  I'm doing my closing, your Honor.
"THE COURT:  Yeah, but your opinion is irrelevant.
"[DEFENSE COUNSEL]:  Okay.
"THE COURT:  Don't misstate the law.
"[DEFENSE COUNSEL]:  Okay.  Well, the law says her word's enough, but I think that in this kind of a case, you need more.
"[PROSECUTOR]:  Objection, your Honor.
"THE COURT:  I made my comment.
"[DEFENSE COUNSEL]:  Well—okay.  Well, the judge says I can't say that.  But anyway, just imagine, you know, you, yourself, someone says, you know—you know, whatever your name is, whatever their names are, 'They touched me when—you know, ten years ago when I was five years old.'  That's all they need to convict you.  They don't need nothing else to convict you.  There was nothing else presented besides the girls' words that [defendant] did anything wrong."

obtained a more favorable result in the absence of error.  [Citations.]  Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim. . . .”  (*People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249; see § 1259.)  We therefore review defendant's claimed instructional error.

“‘We review de novo a claim that the trial court failed to properly instruct the jury on the applicable principles of law.’”  (*People v. Lueth* (2012) 206 Cal.App.4th 189, 195.)  When an appellate court reviews a potentially incomplete or misleading instruction for federal constitutional error, the relevant inquiry is “‘whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction.’  [Citations.]  ‘“‘[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.’”’”  [Citations.]  The reviewing court also must consider the arguments of counsel in assessing the probable impact of the instruction on the jury.”  (*People v. Young* (2005) 34 Cal.4th 1149, 1202.)  We will find error only if it is reasonably likely that the jury instructions altogether provided the jury with an inaccurate understanding of the applicable law.  (*People v. Kelly* (1992) 1 Cal.4th 495, 525-526.)

Defendant asserts the absence of a definition of a complaining witness is erroneous in a case like the present case where several witnesses complained about sexual conduct, but only some or one of these witnesses was the complaining witness in the technical sense.  He argues that if the jury found A.A., K.J., or A.J. to fall within CALCRIM No. 1190, then the jury instruction effectively told the jury that a conviction

30

of a sexual assault crime may be based on the testimony of A.A., K.J., or A.J. alone. We are not persuaded.

Immediately after being instructed on the elements of each charged crime, the jury was told that it could convict the defendant of "a sexual assault crime" based on the "testimony of a complaining witness alone." The context and the content of CALCRIM No. 1190 imply *the victim* of the charged sexual assault crime is the complaining witness. It is not reasonable to interpret the language as permitting a conviction of any of the charged crimes based solely on the testimony of any of the victims of defendant's molestations, charged or not. We reject defendant's rogue assertion that the term "'complaining witness' *does* have a technical meaning." Rather, we conclude the phrase "'''is commonly understood by those familiar with the English language and is not used in a technical sense peculiar to the law.'''" (*People v. Griffin*, *supra*, 33 Cal.4th at pp. 1022-1023.) Thus, there was no need for the trial court to instruct the jury on its meaning. (*Ibid*.)

Other instructions reinforced the concept that a conviction on a particular count required credible witness testimony concerning that count. CALCRIM No. 226 told the jurors that they "alone must judge the credibility or believability of the witnesses." CALCRIM No. 1191 instructed the jurors that, regarding defendant's uncharged offenses against A.A., if they "conclude that the defendant committed the uncharged offenses," this evidence is "not sufficient by itself to prove that the defendant is guilty of" any of the

31

charged offenses against A.J. and K.J.[7]  Similarly, CALCRIM No. 1191B instructed the jurors that, regarding defendant's charged offenses, evidence defendant committed the charged crimes, if proven, could be considered in determining guilt of the charged crimes, but it "is not sufficient by itself to prove that the defendant is guilty of another crime."[8]  We presume the jury understood and followed the instructions.  (*People v. Smith* (2007) 40 Cal.4th 483, 517-518 ["'The crucial assumption underlying our constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions.'"].)  Moreover, during closing argument, the prosecutor reinforced the correct and common sense application of the instructions by linking each charged crime to its specific victim and stressed the importance of each victim's credibility.

Nonetheless, defendant argues the failure to define "complaining witness" was compounded by CALCRIM No. 301, which instructs that the "testimony of only one witness can prove any fact," and CALCRIM No. 303, which instructs that "certain evidence was admitted for a limited purpose" and may be considered "only for that purpose and for no other."  Defendant asserts these instructions support "a mistaken interpretation of CALCRIM No. 1190."  We disagree.  "The instructions in combination are no less correct, and no less fair to both sides, than . . . individually."  (*People v. Gammage* (1992) 2 Cal.4th 693, 701; see *id*. at p. 702 [In cases involving sexual offenses,

---

[7]  Defendant's assertion that the "court wrongfully instructed the jury on a substantive area of law when the court effectively told the jury that it could convict [him] based on the testimony of A.A. alone" is disingenuous.

[8]  As defendant acknowledges, CALCRIM No. 1191B "solve[d] the related issue of the jury using the testimony of K.J. 'alone' to convict for the charges related to A.J."

32

"it is proper for the trial court to give CALJIC No. 10.60 in addition to CALJIC No. 2.27," the predecessor instructions to CALCRIM Nos. 301 and 1190.].) Jurors are permitted to accept a complaining witness's testimony alone in convicting a defendant of a charged sexual offense because, in general, the offense only involves the complaining witness and defendant. The other witnesses' testimony provides corroboration through propensity evidence. Again, the jury was instructed to consider the instructions "together" and follow those that apply (CALCRIM No. 200); we presume they followed this instruction. (*People v. Smith*, *supra*, 40 Cal.4th at pp. 517-518.)

> D. *Effectiveness of Trial Counsel.*

Defendant claims his trial counsel was ineffective for (1) failing to object to the admission of his police interview statements on the grounds his *Miranda* rights were violated; (2) failing to object or request a mistrial based on prosecutorial misconduct when the prosecutor asked the jury to step into the shoes of the victims and their parents and emphasized that as parents it would be their worst nightmare; and (3) failing to object or move for a mistrial when the prosecutor (a) elicited evidence that A.A.'s brother committed suicide after learning defendant had been arrested and (b) argued that molestation leads to suicidal thoughts. We will address each of these issues in turn.

"Under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has the right to the assistance of counsel." (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) To prevail on a claim of ineffective assistance of counsel, a defendant must establish that his counsel's performance was deficient and that he suffered prejudice. (*Strickland v. Washington*

33

(1984) 466 U.S. 668, 687.) "'In determining prejudice, we inquire whether there is a reasonable probability that, but for counsel's deficiencies, the result would have been more favorable to the defendant.' [Citations.] 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" (*People v. Torres* (2018) 25 Cal.App.5th 162, 171.)

"On direct appeal, a finding of deficient performance is warranted where '(1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.' [Citation.] '[W]here counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions.'" (*People v. Johnsen* (Feb. 1, 2021, S040704) ___ Cal.5th ___, ___ [2021 Cal. Lexis 700, at pp. *81-*82].)

        1.     *Miranda issue.*

"*Miranda* requires that a person questioned by police after being 'taken into custody or otherwise deprived of his freedom of action in any significant way . . . [must first] be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.'" (*People v. Torres*, *supra*, 25 Cal.App.5th at p. 172.) Here,

defendant was so advised when Detective Vargas identified and obtained defendant's acknowledgment to each right separately.[9]

Defendant now claims he did not receive full *Miranda* warnings because the detective failed to let him know he could exercise the right to an attorney at any time, i.e., the detective omitted the final sentence of the standard warning. We disagree. According to the transcript of the interview, Detective Vargas stated: "You have the right to talk to a lawyer and have him present with you *while you are being questioned*." (Italics added.) The emphasized portion of the sentence informed defendant that he "could stop himself later in the interview and demand the attorney." In fact, after answering several questions, defendant stopped Detective Vargas and stated, "Well, I need my lawyer."

Defendant also claims the detective failed to get him the attorney he twice requested. After questioning defendant about where and with whom he lived, the following exchange occurred after defendant's initial request for an attorney:

"VARGAS: You want your lawyer?

---

[9] "VARGAS: . . . You have the right to remain silent. Do you understand that? Is that a yes?
"[DEFENDANT]: Yes.
"VARGAS: . . . [A]nything you say can and will be used against you in a court of law. Understand that?
"[DEFENDANT]: Yes, sir.
"VARGAS: You have the right to talk to a lawyer and have him present with you while you are being questioned. Do you understand that?
"[DEFENDANT]: Yes.
"VARGAS: If you cannot afford to hire a lawyer one will be appointed to represent you before any questioning if you wish. Understand that?
"[DEFENDANT]: Yes."

"[DEFENDANT]:  Yeah.

"VARGAS:  Oh okay.  Have fun.  Because—let me explain to you real quick . . .

"[DEFENDANT]:  Okay.

"VARGAS:  It says right here you have the right . . . to remain silent.  Anything you say can be used against . . . [¶] . . . [¶] . . . you in a court of law.  Right?

"[DEFENDANT]:  Right.  So it basically covers that.

"VARGAS:  You have the right to talk to a lawyer.  That's Number 3.

"[DEFENDANT]:  Okay.

"VARGAS:  . . . and you can have him present with you while you are being questioned.  Okay?

"[DEFENDANT]:  I get where you're goin'.

"VARGAS:  So at that point you say, 'Well, I want one here.'

"[DEFENDANT]:  Well I . . .

"VARGAS:  So it's not like I'm playin' tricks on ya.

"[DEFENDANT]:  Well . . .

"VARGAS:  Okay?

"[DEFENDANT]:  Right.  No. . . . I get it.  I'm not saying' that you were.  [¶] . . . [¶] Well . . . to be honest . . . I thought it was bein' a friendly thing and then . . . [¶] . . . [¶] . . . I get where you're goin'.  You have to do your job.

"VARGAS:  Okay.

"[DEFENDANT]: But also too . . . I talked to my pastor and this is the last thing I'll say is . . . I trust in God . . . and I know the truth will come out but I was also taught to be careful.

"VARGAS: Well . . . I understand. I mean, . . . you're not an evil person. . . . I mean, you're not a monster. Okay? Believe me. I've been doin' this for 26 years and I've seen monsters. [¶] . . . [¶] And you're not there. You're not there. Okay?

"[DEFENDANT]: I'm a big teddy bear.

"VARGAS: . . . Getting in a conversation with you and . . . hearin' you and I can tell you're not a monster. Okay? . . .

"[DEFENDANT]: Look, Detective Vargas. I'm gonna talk to my lawyer but I'm gonna tell you this one thing."

Defendant then provided background information about A.J. and K.J.'s family; he claimed their mother was unfaithful and her husband liked to watch, and family members walked in on each other while using the bathroom. When defendant began discussing the accusations made against him, noting this was not the first time his niece accused him of something, Detective Vargas interrupted. The detective stated, "Well let me say you're talkin' about accusations and stuff like that and because . . . you had requested a lawyer I can't really ask you [to] clarify . . . [¶] . . . which accusation you're talkin' about." Defendant acknowledged the detective's comment and continued to talk about A.J. Detective Vargas then asked, "[I]s it okay if I ask you questions here?" Defendant replied, "Go ahead." The detective asked again, "[S]o . . . it's okay if I ask you questions?" Defendant replied, "Okay. Yes." At the end of the interview, defendant

37

affirmed his understanding that he had a right to an attorney and that he decided to speak anyway.[10]

Based on the transcript of defendant's interview, defendant "clearly asserted his right to counsel," requiring Detective Vargas to cease his interrogation until counsel was provided or defendant clearly stated his decision to proceed without counsel. (*Edwards v. Arizona* (1981) 451 U.S. 477, 482, 484-485 (*Edwards*).) According to *Edwards*, "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation . . . . We further hold that *an accused . . . , having expressed his desire to deal with the police only through counsel, is not subject to further interrogation* by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication*, *exchanges*, *or conversations with the police*." (*Id*. at pp. 484-485, italics added.) Although Detective Vargas stopped asking personal questions of defendant, he (the detective) continued talking, reiterating defendant's rights, confirming his request for an attorney, and then

---

[10] "VARGAS: Earlier . . . on in the conversation you asked for an attorney. . . .
"[DEFENDANT]: Right.
"VARGAS: And I understood that. I – again . . .
"[DEFENDANT]: And . . .
"VARGAS: . . . and you want to say . . .
"[DEFENDANT]: I said for you to go ahead and talk to me and I shouldn't have but yeah.
"VARGAS: No. I mean, and I . . . did reiterate that so I made sure.
"[DEFENDANT]: Yeah. No. I know you did. You covered your . . . legal bases.
"VARGAS: Yeah. And I wanna make sure 'cause I don't want . . . [¶] . . . no confusion here.
"[DEFENDANT]: Yeah."

attempting to gain his trust by telling him, "[Y]ou're not an evil person. . . . I mean, you're not a monster. Okay?" As a result of this exchange, defendant stated, "I'm gonna talk to my lawyer but I'm gonna tell you this one thing." This "one thing" was defendant's observations of A.J. and K.J.'s family. When defendant broached the subject of the accusations made against him, Detective Vargas immediately stopped him and reminded him that he had requested an attorney and, thus, the detective could not ask for clarifications. Defendant acknowledged the detective's comment but continued to talk. Detective Vargas then asked—twice—for defendant's permission to question him, and defendant provided it.

Because Detective Vargas's artful statements lured defendant into continuing the interview without the presence of his counsel and without a *clear statement* that he had decided to proceed without counsel, we must conclude the statements from defendant's interrogation were taken in violation of *Edwards*.

Although statements taken in violation *Edwards* are excluded from evidence in the prosecution's case-in-chief, they may be used to impeach a defendant's credibility as a witness. (*Harris v. New York* (1971) 401 U.S. 222, 224, 226 (*Harris*) [A statement taken without proper *Miranda* advisements may be admitted for impeachment purposes.]; *Oregon v. Hass* (1975) 420 U.S. 714, 722 [Pursuant to the *Harris* rule, a statement taken after the police fail to honor the suspect's invocation of the right to counsel during interrogation is admissible for impeachment purposes.]; *People v. Peevy* (1998) 17 Cal.4th 1184, 1196 [The *Harris* rule applies "even if the individual police officer violates *Miranda* and *Edwards* by purposefully failing to honor a suspect's invocation of

39

his or her right to counsel."].)  Here, the prosecution did not use defendant's statements as evidence of his crimes.  Rather, the statements were used to impeach his trial testimony.  Under *Harris*, *Hass*, and *Peevy*, such use is permissible.

Moreover, while there were some inconsistencies between defendant's interview statements and trial testimony (i.e., whether he went into the girls' bedrooms and covered them with blankets at night), he maintained his innocence and attributed any inconsistencies to the fact that he was "nervous and freaked out and scared," or "blacking out" during his interview.  We, therefore, conclude defense counsel was not deficient for failing to object to the use of defendant's interview statements for impeachment purposes only.

### 2. *Prosecutorial Error.*[11]

Defendant contends that some of the prosecutor's closing remarks, and comments during voir dire, constitute error because they improperly appeal to the jury's passion and prejudice.  The People assert the prosecutor was simply trying to draw on everyday experiences in an attempt to argue that the victims were credible because they acted as one would expect victims to behave.  However, the People acknowledge the prosecutor improperly suggested the jurors should consider their fear for their child being touched in a sexual manner but argue it was harmless.  As we explain, we reject defendant's contentions.

---

[11] "'[T]he term prosecutorial "misconduct" is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind.  A more apt description of the transgression is prosecutorial error.'" (*People v. Centeno* (2014) 60 Cal.4th 659, 666.)

a.    Additional factual and procedural background.

During voir dire, the jury was questioned concerning the burden of proof; the presumption of innocence; the role of the court, counsel, and jury; the fact that children both lie and tell the truth; and the jurors' ability to decide credibility. The prosecutor inquired whether jurors had experienced "something traumatic" with their children, and pointed out various responses, such as fight, flight, or freezing up. He then stated, "Tell us about your last sexual experience." Before anyone could respond, the prosecutor directed the jurors to think about their emotions and "[w]hat went through [their] mind or . . . body." The purpose was to have jurors experience a feeling of discomfort in possibly discussing the topic to consider their body language if forced to respond to the question publicly. One juror disclosed, "I would probably look away. I don't like to see. I'm being honest." In response, the prosecutor stated, "Right. And we're talking about being honest. [¶] . . . [¶] [And,] when you're judging if someone is being honest or not, what do you look for?" The juror replied, "[B]ody language." Later on, another juror added, "There are times when the subject is very uncomfortable, and the person being questioned just may feel better not making eye contact."

During closing argument, the prosecutor reiterated the difficulty people experience in reporting sexual matters by pointing out how K.J. responded to defendant's molestations: she suppressed it, acted out, and became hysterical. Reporting the abuse was difficult for her. Referring back to his voir dire statement, "'Tell me about your last sexual experience,'" the prosecutor argued that it was difficult for K.J. to disclose what defendant had done to her because of the intimate nature of his actions.

41

Later, while going through the elements of the offenses, the prosecutor argued: "So I do want to talk to you about [the victims'] reactions. . . . All three women in this case had a different reaction. [A.J.] fought back. She spoke up immediately. [K.J.] froze. She didn't do anything most of the time. She let it happen because she was scared. She waited to tell. [A.A.] ran. She literally ran away from her home to get away from the defendant. [¶] . . . [¶] They were children, not an adult, okay. So when considering their reactions, consider it's a child. It's not an adult with life experience. This should happen. That should happen. And think about a child's fears, about not being believed, about it not getting fixed. And that actually came true here because when [A.A.] came forward, [defendant] didn't get in trouble. They just separated him. He didn't have access to her again. When [A.J.] came forward, again, it was a separation thing. . . . [¶] And think about what happens if you're not believed? One, it's shameful. Two, people think you're a liar about this kind of thing. But three, now the person that's been abusing you knows that you told and knows that they got away with it, so how are they going to treat you after that? Things to consider when thinking why they kept silent."

In response, defense counsel argued the victims were not credible and claimed K.J.'s "dream that [defendant] molested [her] when [she] was a kid" was not sufficient, her delayed disclosure was suspect, and she was a drug addict, wild, and a car thief. In reply, the prosecutor argued: "[Defense counsel] spent time on [K.J.], and he said, 'Well, she uses drugs. She uses cocaine, this, that.' But I have a question, a question for all of you. You, as a parent, what's your fear for your child being touched in a sexual manner?

42

And let's say not a rape, but just touched over and over again on their vagina or their breasts. Now, is that touching going to leave a physical scar? Is it going to leave a mark for the rest of their life physically? Or, when you think about that touch, when you think about that happening to a loved one, your stomach drops, you get goosebumps. Because it's not a physical or emotional—a physical scar. It's an emotional scar. It's what you fear they have to live with the rest of their life, the pain, the suffering. And what comes with pain and suffering sometimes? Drug use, suicidal thoughts. [¶] So to say, 'Well, she used drugs. She had mental health issues. You can't believe her,' why not ask the question, why is she using drugs? Why does she have mental health issues? I think, when you answer that question amongst yourselves, again, it's going to become clear."

                    b.          Applicable legal principles.

"'A prosecutor's conduct violates a defendant's constitutional rights when the behavior comprises a pattern of conduct so egregious that it infects "'the trial with unfairness as to make the resulting conviction a denial of due process.' [Citation.]" [Citation.] The focus of the inquiry is on the effect of the prosecutor's action on the defendant, not on the intent or bad faith of the prosecutor. [Citation.] Conduct that does not render a trial fundamentally unfair is error under state law only when it involves ""the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.""""" (*People v. Young* (2019) 7 Cal.5th 905, 932.)

It is misconduct for the prosecutor to appeal "to the sympathy or passion of the jury" by asking jurors to imagine if the charged offense had happened to one of their children. (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1250 (*Pensinger*).) "When

attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.  [Citations.]  In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.'"  (*People v. Centeno*, *supra*, 60 Cal.4th at p. 667.)

c.        Analysis.

Applying the above principles, we find no prosecutorial error.  The prosecutor's suggestion, in rebuttal, that the jury should consider their "fear for [their] child being touched in a sexual manner," appears to be improper when viewed in isolation.  However, when viewed in the context in which the suggestion was made, it was not.  (See *Darden v. Wainwright* (1986) 477 U.S. 168, 179 ["The prosecutors' comments must be evaluated in light of the defense argument that preceded it."].)  During closing argument, defense counsel attacked K.J.'s credibility by asserting she was "trying to blame" "all her bad conduct" (drug addiction, stealing from people, psychiatric hospitalization, and confusing a dream for reality) on defendant.  In response, the prosecutor argued that defendant's actions left K.J. with emotional scars and pain that caused her to act out, use drugs, and feel suicidal.  He did not attempt to inflame the jurors' passions.  Rather, he directed them to consider the cause of K.J.'s mental health issues and drug use when evaluating her credibility.  Moreover, the evidence against defendant was solid, the victims were credible witnesses, and the jury was instructed they should not be influenced by bias, sympathy, or prejudice, and nothing the attorneys say

44

should be considered evidence. (CALCRIM Nos. 200, 222.) In the context of the whole argument and the instructions, there is no reasonable likelihood the jury misapplied the prosecutor's comments.

Nonetheless, defendant cites several cases involving a prosecutor's remarks, which appealed to the jury's passion and prejudice. (*Pensinger*, *supra*, 52 Cal.3d at pp. 1250-1251; *People v. Jones* (1970) 7 Cal.App.3d 358, 363-364 (*Jones*); *People v. Fields* (1983) 35 Cal.3d 329, 362-363 (*Fields*); and *People v. Simington* (1993) 19 Cal.App.4th 1374, 1379 (*Simington*).) However, in each of these cases, the court found the misconduct to be nonprejudicial. (*Simington*, at p. 1379.) "In *Pensinger*, the defendant was charged with an assortment of offenses including kidnapping and murder of a child. In closing argument, the prosecutor stated: '"Suppose instead of being Vickie Melander's kid [the victim] this had happened to one of your children."' [Citation.] The court found the prosecutor's remark to be an improper appeal to the jury's passion and prejudice. Similarly, in [*Jones*], the defendant was charged with assaulting a motorcyclist. The prosecutor's remarks in argument 'to the effect that the sons of the jurors and their girlfriends dare not ride motorcycles into an area where the appellant is located, because he reacts seriously,' were held to be misconduct. [Citation.] The court described the remarks as 'a crude appeal to the fears and emotions of the jurors . . . .' [Citation.] In [*Fields*], the prosecutor invited the jury to 'view the case through the eyes of the victim.' This invitation was deemed misconduct since it encouraged jurors 'to depart from their duty to view the evidence objectively . . . .'" (*Simington*, *supra*, 19 Cal.App.4th at pp. 1378-1379.) But, the misconduct was nonprejudicial. (*Id*. at p. 1379.)

45

In *Simington*, the prosecutor "asked the jurors to place themselves in the position of an innocent victim who is assaulted with a knife and sustains serious injuries." (*Ibid.*) The *Simington* court could not say "that it [was] reasonably probable that a different result would have been reached in the absence of these remarks." (*Ibid.*)

As previously stated, the prosecutor was not asking the jurors to consider how they would feel if their children were molestation victims. He asked them to consider whether K.J.'s, A.J.'s, and A.A.'s behavior was consistent with how the jurors would expect molestation victims to behave. As such, the prosecutor did not err. Even if we assume error, on this record, we conclude it was harmless. (*Fields*, *supra*, 35 Cal.3d at p. 363 [There is "no reasonable probability that the prosecutor's appeal to the jurors' sympathy for the victim affected the verdict rendered."].)

### 3. *Evidence of R.R.'s suicide.*

Defendant faults his trial counsel for failing to object to A.A.'s testimony that her brother committed suicide two weeks after learning about defendant's arrest.

#### a. Additional factual and procedural background.

Before trial, defense counsel moved to exclude any evidence that R.R.'s suicide was attributable to defendant. The prosecutor agreed and advised the trial court that he would work with defense counsel to sanitize A.A.'s testimony to "make it not prejudicial, but to also explain why some witnesses are not available to testify."

During A.A.'s testimony, she explained that she first learned about defendant's offenses against A.J. and K.J. when their mother, Sh., called her on the day of her

46

brother's funeral. When asked if she told Sh. what had happened to her, the following exchange occurred:

"[A.A.]: When I found out that [defendant] was in jail, he called—at my brother's funeral, I got a phone call that it was him. I walked away from the phone. My husband was told, '[Defendant] wants to talk to you.' He walked away from the phone. It was real to me that he was actually in jail because, see, my brother, he committed suicide. It was really, really—he bought a gun two weeks after [defendant] was arrested.

"[PROSECUTOR]: Let me stop you there.

"[A.A.]: I'm sorry.

"[PROSECUTOR:] Remember we talked beforehand. Just—

"[A.A.]: I don't know. Just to say I was distraught over my brother.

"[PROSECUTOR:] Okay."

Defense counsel did not object but immediately cross-examined A.A. concerning Sh.'s efforts to enlist A.A.'s help with the case against defendant.

During closing argument, the prosecutor stated: "You heard the stipulation that [R.R.] is not here to testify, and you heard why. No fault of anybody's here, but you can't bring somebody back from the dead, so he's not here to testify." Later, in response to defense counsel's attack on K.J.'s credibility, the prosecutor argued that child sexual abuse results in emotional scars that lead to drug use, criminal behavior, and suicidal thoughts.

47

b. Analysis.

Regarding A.A.'s reference to her brother's suicide, the prosecutor immediately prevented her from elaborating on her thoughts and feelings. Defense counsel's failure to object to A.A.'s testimony was a reasonable tactical decision, such as not wanting to emphasize the evidence. (See *People v. Ferraez* (2003) 112 Cal.App.4th 925, 935 [The decision "'not to object to the admission of evidence is inherently tactical, and a failure to object will seldom establish ineffective assistance.'"].) As to the prosecutor's reference to the brother's suicide during closing, arguably it connected the brother's suicide to the abuse defendant inflicted on him. However, given K.J.'s attempted suicide and psychiatric hospitalization, the prosecutor's comments about suicidal ideation were appropriate. Therefore, defense counsel was not ineffective in failing to object to the evidence or move for a mistrial. (See *People v. Anderson* (2001) 25 Cal.4th 543, 587 ["Counsel is not required to proffer futile objections."].)

E. *Cumulative Effect of Any Errors.*

Last, defendant contends the cumulative effect of the errors at trial warrants reversal of the judgment. "In examining a claim of cumulative error, the critical question is whether [the] defendant received due process and a fair trial." (*People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1068.)

Here, we have found a few isolated instances of error in defendant's trial, specifically, defense counsel's failure to object to (1) the use of defendant's interview statement, (2) the prosecutor's closing request for jurors to consider whether the victims' behavior was consistent with how jurors would expect molestation victims to behave, and

48

(3) the prosecutor's closing referencing R.R.'s suicide. However, even taking the cumulative effect of these errors into account, we remain satisfied defendant received a fair trial. The errors did not affect the evidence of defendant's guilt. The jury heard from K.J., A.J., and A.A. about defendant's sexually deviant actions, some of which were corroborated by the testimony of others (K.J.'s brother, D.H., and grandfather). Given the strong evidence presented, defense counsel's failure to object to the use of defendant's statement for impeachment purposes or the prosecutor's arguable acts of misconduct did not render the trial fundamentally unfair. (*People v. Cain* (1995) 10 Cal.4th 1, 82 ["Defendant was entitled to a fair trial, not a perfect one."].)

## III. DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
Acting P. J.

We concur:


RAPHAEL
J.


MENETREZ
J.

49